UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| ROBIN ANNETTE BROOKS,<br><br>  Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,[1]<br><br>  Defendant. | Case No. 1:16-cv-00032<br><br>Chief Judge Crenshaw<br>Magistrate Judge Newbern |

To: The Honorable Waverly D. Crenshaw, Jr., Chief Judge

### REPORT AND RECOMMENDATION

Pending before the Court in this Social Security appeal is Plaintiff Robin Annette Brooks's motion for judgment on the administrative record (Doc. No. 18), to which the Commissioner of Social Security has responded (Doc. No. 20). Upon consideration of these filings and the transcript of the administrative record (Doc. No. 14),[2] and for the reasons given below, the undersigned RECOMMENDS that Brooks's motion for judgment be GRANTED, that the decision of the Commissioner be REVERSED, and that the cause REMANDED for further administrative proceedings consistent with this report.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2] Referenced hereinafter by the abbreviation "Tr."

**I.    Background**

Brooks filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on February 20, 2013, alleging disability based on bulging discs and arthritis in her back, degenerative disc disease, and high blood pressure. (Tr. 28, 111–12, 226.) Tennessee Disability Determination Services (DDS) denied Brooks's claims upon initial review and again following her request for reconsideration. Brooks requested de novo review of her case by an Administrative Law Judge (ALJ). The ALJ heard the case on March 4, 2015, and Brooks appeared with counsel and gave testimony. (Tr. 45–82.) A vocational expert (VE) also testified at the hearing. At the conclusion of the hearing, the ALJ took the matter under advisement until May 12, 2015, when he issued a written decision finding Brooks not disabled. (Tr. 28–37.) That decision contains the following enumerated findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since November 6, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: obesity, lumbosacral spondylosis with myelopathy, osteoarthritis of the right knee, and arthritic changes of the left knee (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except with no climbing ladders/ropes/scaffolds; occasional climbing ramps/stairs, balancing, stooping, crouching, kneeling or crawling; no walking on uneven surfaces; and limited to standing/walking 4 hours in an 8-hour workday.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 30, 1962 and was 42 years old, which is defined as a younger individual age 18–49, on the [original] alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 30, 32, 35–37.)

On May 5, 2016, the Appeals Council denied Brooks's request for review of the ALJ's decision (Tr. 1–3), rendering that decision final. This action seeking review was timely filed on May 5, 2016. 42 U.S.C. § 405(g).

**II. Review of the Record**

The following review is taken from Brooks's Memorandum (Doc. No. 19) in support of her Motion for Judgment on the Administrative Record:

> On the amended alleged onset date, Plaintiff was 50 years old. (Tr. 28, 203.) She has an eighth grade education. (Tr. 227.) She has past work as a caregiver, harness builder, and laborer. (Tr. 228.)
>
> A. Concise Summary of the Medical Records
>
> On the alleged onset date of November 6, 2012, Plaintiff underwent MRI of the lumbar spine ordered by her longtime pain management doctor Damon Dozier, M.D. (he had been treating her since at least January 4, 2012 on at least six occasions – Tr. 321, 324, 327, 329, 334, 336). (Tr. 362.) At L1-L2 there was moderate disc space narrowing; and at L5-S1 there was severe disc space

narrowing, mild broad-based posterior disc bulge, and moderate bilateral facet arthropathy. (Tr. 362.) The overall impression was multilevel spondylosis [without spinal or foraminal stenosis, no change when compared to a previous MRI dated July 20, 2009]. (Tr. 362.)

Between November 2012 and April of 2013, Plaintiff treated with Dr. Dozier on four occasions for pain management related to her lower back pain that radiated into her hips. (Tr. 311–21, 437–40.) During these visits it was noted Plaintiff's problems included depressive disorder, pain in her lower leg, lumbosacral spondylosis without myelopathy, degeneration of thoracic or lumbar intervertebral disc, cervicalgia, pain in her thoracic spine, and lumbago. (Tr. 312.) Examinations by Dr. Dozier showed tenderness over the spinous process from . . . L1-L5, decreased extension, a depressed mood, decreased range of motion, limited ambulation, mildly increased pain with facet-loading, and tenderness of the SI joints. (Tr. 313, 317, 320, 439.) During this period, Plaintiff was diagnosed with degeneration of the thoracic or lumbar intervertebral disc; lumbago; depressive disorder; pain in the thoracic spine; lumbosacral spondylosis without myelopathy; and cervicalgia. (Tr. 314, 317, 321.) Injections were planned, and she was prescribed Ibuprofen, Cymbalta, Lortab, Venlafaxine, methocarbamol, and Neurontin. (Tr. 314–15, 317–18, 320–21.) In April 2013, Dr. Dozier performed a radiofrequency ablation of the lumbar medial branch and dorsal ramus of L5. (Tr. 393, 439.)

On May 8, 2013, Plaintiff presented to Donita Keown, M.D., per the referral of the Tennessee Disability Determination Services for a consultative physical examination. (Tr. 372.) Here, Plaintiff reported a long history of chronic stiffness and pain in the lower back; and she reported epidural steroids and radiofrequency ablation had not improved her condition. (Tr. 372.) She also reported radiating discomfort into the bilateral buttocks and lateral thighs. (Tr. 372.) Examination revealed Plaintiff was 64 inches tall and weighed 284 pounds. (Tr. 372–73.) Dr. Keown diagnosed chronic low back pain with degenerative disc disease and facet arthropathy[;] bilateral knee pain, likely attributable to degenerative joint disease; morbid obesity, not limiting mobility; hypertension; tobacco abuse; and gastroesophageal reflux disease ("GERD"). (Tr. 374.) Dr. Keown opined Plaintiff can perform work at a light to medium exertional level. (Tr. 374.)

That same date she presented to Michael C. Loftin, Ph.D., for a psychological consultative examination per the referral of the Tennessee Disability Determination Services. (Tr. 376.) Dr. Loftin noted Plaintiff walked slowly. (Tr. 377.) Plaintiff relayed dropping out of school at 15 to get married, and that she repeated first grade. (Tr. 377.) Plaintiff noted previously being prescribed psychiatric medications for anxiety, stress, and sleep, specifically Elavil, Effexor, and Xanax. (Tr. 378.) Plaintiff essentially reported very mild mental health problems such as normal routine stress. (Tr. 378.) Dr. Loftin noted Plaintiff's mood during the evaluation was "mildly stressed yet euthymic at other times." (Tr. 379.) He opined Plaintiff is mildly impaired in her ability to adapt to change. (Tr. 380.) [Dr. Loftin reported the

4

following activities of daily living, as reported by Brooks: "She states that she can prepare elaborate meals[,] . . . wash dishes, dust, clean windows, and clean the bathroom. She states that she has a driver's license and drives about once a week. Ms. Brooks states that her hobbies are reading, visiting with her neighbor, spending time with her son and grandchild, and watching television." (Tr. 380.)]

On July 11, 2013, Plaintiff treated with Nurse Practitioner Jocelyn Stauffer at Dr. Dozier's clinic for back pain described as dull, throbbing, and achy; and as radiating to her legs. (Tr. 386.) Associated symptoms included tingling and numbness of her feet. (Tr. 386.) Examination showed decreased extension in the lumbar spine as well as tenderness over the spinous process from L3-L5. (Tr. 386–87.) In the assessment, NP Stauffer noted Plaintiff's pain was typically 8/10 without medications and 3/10 with medications, and this lasted about 5 to 5 ½ hours. (Tr. 387.) NP Stauffer maintained similar diagnoses as Dr. Dozier. Plaintiff returned to NP Stauffer in September of 2013 where she reported pain level as 6/10 and that it was interfering with her sleep. (Tr. 383.) Plaintiff described her pain as "sometimes" radiating to her legs. (Tr. 383.) Examination was similar as in July, and described her pain as 8-9/10 without medications, but that it improved to 2-3/10 with medications but lasted only 4-5 hours. (Tr. 384.)

On January 9, 2014, Plaintiff treated with NP Stauffer for pain in her cervical, lumbar, and thoracic spine, as well as knee pain. (Tr. 422.) Here, she was 66 inches and 294 pounds. (Tr. 422.) Plaintiff described her pain as dull and radiating to her knees, and that it interfered with her sleep. (Tr. 424.) She also described numbness in her left foot. (Tr. 424.) Examination showed tenderness and limited range of motion in both knees. Plaintiff was also tender to palpation in the spine and had decreased range of motion. (Tr. 424.) The assessment was lower back pain with tingling into her left foot, as well as bilateral knee pain with the right being worse than the left. (Tr. 424.) NP Stauffer noted Plaintiff was still having pain in her lower thoracic spine radiating to the left side. (Tr. 424.) NP Stauffer again indicated Plaintiff's pain was 8-10/10 without medications, but "improves to 4-5/10, or 2/10, lasting 5 hours." (Tr. 424.) NP Stauffer diagnosed "two-level lumbosacral spondylosis without myelopathy," knee pain, pain in the cervical spine, low back pain, and pain in the thoracic spine. (Tr. 424–25.) It was noted Plaintiff was undergoing long-term drug therapy. (Tr. 425.) Lortab was prescribed, and injections in the knee were planned. (Tr. 425.) An x-ray of the knee taken January 8, 2014 and related to this visit, revealed the following impressions: "prominent findings of chondromalacia of the patella and arthritic change in the right knee including some mild to moderate narrowing of the cartilage space in the medial compartment;" "less pronounced arthritic changes in the left knee;" and "minimal malalignment in both knees." (Tr. 447.)

In March of 2014, Plaintiff followed up with NP Stauffer for low back and right knee pain. (Tr. 417.) Plaintiff reported her pain as 6/10 (moderate). Examination revealed Plaintiff was morbidly obese, that she had tenderness and limited range of motion in the right knee, that she had decreased extension in the lumbar spine, and

5

tenderness over the spinous process from L1-L5. (Tr. 419.) Here it was noted Plaintiff had a right knee steroid injection in February, and reported her knee was "great" for the first week and a half, but that she now had soreness and stiffness. (Tr. 419.) Norco, Neurontin, Effexor, and methocarbamol were all prescribed. (Tr. 420.) Plaintiff returned in May of 2014 and reported 4-6/10 pain (moderate) and examination revealed tenderness and limited range of motion in the right knee. (Tr. 416.) NP Stauffer's assessment was that Plaintiff's back pain remained the same but her right knee pain was getting worse. (Tr. 416.)

Between July and September 2014, Plaintiff treated with Jeff Norton, PA-C, for right knee pain she rated as 6-9/10 depending upon how much activity she employed her knee to do. (Tr. 445.) Plaintiff also indicated her knee is unstable at times and gives away. (Tr. 442–45.) She reported it ached and throbbed. (Tr. 445.) Examination revealed trace swelling at the medial joint line of the right knee with tenderness to palpation at the medial joint line. (Tr. 442–45.) It was noted x-rays revealed "moderate medial compartment osteoarthritis and narrowing." (Tr. 442–45.) A brace was provided and injections were planned. (Tr. 445.) Plaintiff underwent injections in July 2014 (Tr. 444), August 2014 (Tr. 443), and September 2014 (Tr. 442).

On July 30, 2014, Plaintiff treated with Dr. Dozier where she reported pain in the lumbar spine radiating to her right lower extremity. (Tr. 412–13.) Plaintiff described her pain as worsening, and 5-6/10. (Tr. 412–13.) Aggravating factors included movement/positioning, bending over, and twisting. (Tr. 413.) On examination, Dr. Dozier found Plaintiff obese and had limited ambulation. (Tr. 413.) He found her neck had pain with motion. (Tr. 413.) He noted tenderness over the spinous process from L2-L5, and instability of both knees. (Tr. 413.) He found she had pain with walking, and neurologically he found she had abnormal sensation in her bilateral lower extremities. (Tr. 413.) Dr. Dozier in his assessment noted that Plaintiff indicated that her right knee injection gave her "red face" and put her down for 3 days. (Tr. 413.) He indicated Plaintiff felt like she was "in a flare" with respect to her knees. (Tr. 413.) Plaintiff reported 6/10 pain with medication. (Tr. 413.) For "two-level lumbosacral spondylosis without myelopathy," Dr. Dozier prescribed Norco and Neurontin. (Tr. 413.) For knee pain he prescribed a Medrol dose pack. (Tr. 414.) For severe nausea, he prescribed promethazine. (Tr. 414.)

On October 7, 2014, Plaintiff treated with Dr. Dozier for lumbar pain described as 7 out of 10. (Tr. 406.) In his assessment, Dr. Dozier noted Plaintiff's previous radiofrequency ablation had improved her back pain greater than 60 percent for 11 months, and that Plaintiff strongly desired another procedure. (Tr. 407.) It appears another radiofrequency ablation was [to be] performed on that day [, but the procedure was "aborted at patient request."] (Tr. 407.)

On October 23, 2014, Plaintiff treated with her primary care physician, Dr. Coleman who on examination found bilateral knee pain and low back pain with extension and flexion. (Tr. 464.) Dr. Coleman diagnosed diabetes mellitus

(metformin was prescribed), GERD (omeprazole was prescribed), lumbago (nothing prescribed), hypertension (Ibuprofen was prescribed), and degenerative joint disease (nothing prescribed). (Tr. 464.)

On February 23, 2015, Dr. Dozier completed a residual functional capacity questionnaire indicating he (or his clinic) has treated Plaintiff every 30 to 60 days since 2011. (Tr. 458.) He listed several numerical diagnoses, and noted Plaintiff had chronic spine pain radiating to her bilateral lower extremities, as well as bilateral knee pain that caused her trouble standing. (Tr. 458.) Dr. Dozier indicated Plaintiff's symptoms included chronic limiting pain, and he further noted knee replacement surgery may be beneficial for Plaintiff. (Tr. 458.) He reported side-effects from Plaintiff's medications included dizziness and GERD. (Tr. 458.) Dr. Dozier opined Plaintiff's symptoms associated with her impairments would constantly be severe enough to interfere with the attention and concentration required to perform simple work-related tasks. (Tr. 458.) He opined Plaintiff would need to recline or lie down during a hypothetical 8-hour workday in excess of typical breaks. (Tr. 458.) Dr. Dozier opined Plaintiff has the following limitations: she cannot walk a half block without rest or significant pain; she can sit for 30 minutes at one time and 1 hour total in an 8-hour workday; she can stand/walk 10 minutes at a time but cannot stand for 1 hour total in an 8-hour workday; she would need a job permitting shifting positions at will from sitting, standing, or walking; she would need unscheduled breaks 4 times daily lasting greater than 15 minutes in duration; she can occasionally lift less than 10 pounds but never more weight; she can use her hands to grasp, turn, and twist objects 25 percent of the workday; she can use her fingers for fine manipulation 50 percent of the workday; she can use her arms for reaching 10 percent of the workday; she is not a malingerer; and she would miss work once or twice per month as a result of treatments or impairments. (Tr. 458–59.)

### B. Plaintiff's Hearing Testimony

Plaintiff testified to the following: Her son and his wife do the majority of cooking and all the cleaning. (Tr. 51.) She can go to the store when she is not on pain medication or hurting really bad. (Tr. 51.) She had to quit babysitting because she could no longer physically perform the work. (Tr. 51.)

She has difficulty bending over due to back pain, and she is in pain all the time when she sits down. (Tr. 64.) She has custody over her six year old nephew, so she tries to use her pain medication only when she has to. (Tr. 64.) She sits in a recliner because it takes the pressure off of her spine. (Tr. 64–65.) She does this two to three hours per day on and off. (Tr. 65.) She is on Lortab four times a day, and Morphine, but she does not always take the Morphine because it makes her sick. (Tr. 66.) Lortab also makes her nauseous, and Phenergan makes her sleepy. (Tr. 66.) There are days when her pain is worse than others; if she has an active day, she will be in pain that evening. (Tr. 67.) An active day is essentially when she leaves the house, and when she does this she will put on a back and knee brace. (Tr. 68.) If she goes

shopping at Wal-Mart, she will use a motorized cart. (Tr. 68.) If she does any household chores such as laundry or folding clothes, she will be in pain the next day. (Tr. 69.)

Her right knee is pretty bad. (Tr. 69.) Her doctors have told her that she would eventually need a knee replacement, but they wanted her to be at least 60 years old before she gets it. (Tr. 69.) Even with injections she still has significant pain. (Tr. 71.) She does use a cane when she goes out or goes down steps. (Tr. 71.) She has difficulty walking upstairs, and she avoids using stairs when she can. (Tr. 72.)

When Plaintiff went to her consultative examination with Dr. Keown, the doctor did not spend a lot of time with her. (Tr. 79.) When she was there, she was limping, despite Dr. Keown's statement that Plaintiff was not in pain and did not have any limitations. (Tr. 79.) All Dr. Keown did was have her "get up on the table, and she took the little thing, checked my reflexes and had me do this, and bend over, this and that, and said bye." (Tr. 79.) This examination was essentially not a real doctor's examination, and it lasted maybe seven to ten minutes. (Tr. 79–80.)

Plaintiff testified that when she has chores, she will sit down during the middle of them until her pain lessens, and that she can "never" stand over 30 minutes at a time. (Tr. 81.)

### C. Vocational Expert's Testimony

The vocational expert ("VE") testified that someone with Plaintiff's age, education, work experience, and the ALJ's determined residual functional capacity could perform work as a cashier, counter clerk, and storage facility rental clerk. (Tr. 75–76.)

(Doc. No. 19, PageID# 531–38.)

## III. Analysis

### A. Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct

legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id*. at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's case under a five-step sequential evaluation process, described as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The agency can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)). When determining a claimant's residual functional capacity (RFC) at steps four and five, the agency must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

C. **Brooks's Statement of Errors**

Brooks's central arguments are that the ALJ erred in rejecting the opinion of her treating pain-management physician Dr. Dozier, and that he erred in determining the credibility of her pain complaints by focusing on the fact of her ability to do certain household chores without considering her need to work at a reduced pace and with a number of breaks. In particular, Brooks contends that the ALJ's finding of her ability to stand or walk for four out of eight hours is "at odds with Dr. Dozier's opinion" and "simply does not fit with the objective evidence of record," which

reveals "a morbidly obese, 50 plus year old woman with significant back problems and arthritis in her knees" that may ultimately require replacement of the knee joints. (Doc. No. 19, PageID# 545.) Brooks characterizes the ALJ's finding of her standing and walking capability as "generated out of thin air," "without the benefit of a well-supported opinion from a medical expert" confirming that capability. (*Id.* at PageID# 545–46.) She suggests that the ALJ made this determination in order to avoid finding Brooks capable of only sedentary work, which, at her age and with her limited education, would have rendered her disabled under the applicable grid rule. (*Id.* at PageID# 545.)

On February 23, 2015, Dr. Dozier opined that Brooks's chronic lower back and arthritic knee pain was so significant that it would limit her to one hour of sitting and less than an hour of standing or walking during an eight-hour workday; it would also keep her from being able to lift ten pounds. (Tr. 458–59.) The ALJ found this opinion "inconsistent with the objective medical evidence, including [Dr. Dozier's] own treatment notes" which record, in the ALJ's opinion, "improvement of back and knee pain with pain management" and a course of treatment that "has not been consistent with what one would expect" if Brooks were so gravely limited by her pain. (Tr. 35.) Where a treating physician's opinion is not entitled to controlling weight because of a lack of consistency with the clinical evidence or with other substantial evidence in the record, the ALJ must weigh the opinion in light of factors including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician," and good reasons for the weight he ultimately assigns to the opinion. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "When deciding if a physician's opinion is consistent with the record [as a

12

whole], the ALJ may consider evidence such as the claimant's credibility, whether or not the findings are supported by objective medical evidence, as well as the opinions of every other physician of record." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010).

Here, the ALJ properly determined that Dr. Dozier's treatment notes conflict with his assessment of Brooks to the extent that they document "that pain management treatment for [Brooks's] back and injections to her knee have helped significantly." (Tr. 34.) The ALJ further found that, with treatment, Brooks "remain[ed] ambulatory despite her back and knee pain." *Id.* He found her pain complaints inconsistent with her daily activity reports in March and May of 2013, when she acknowledged that she shops once per month, attends church, "prepares elaborate meals, washes dishes, dusts, cleans windows, cleans bathrooms, drives once per week, and visits with neighbors[.]" (Tr. 35.)

Substantial evidence supports the ALJ's findings as to Brooks's condition, but only up to a point. Specifically, the medical evidence shows that the nerve blocks, prescription medication, and radiofrequency ablation treatment Brooks received from Dr. Dozier alleviated her back pain to the extent that she was able to remain mobile enough to engage in the daily activities she reported in early 2013 (Tr. 234–41, 380; *see also* Tr. 314 (noting Brooks "[d]eclares [treatment] reduces her pain and affords ADLs/AADLs [activities of daily living/advanced activities of daily living]")), including moving her residence in the summer of 2013. (Tr. 431, 433, 436.) To that point in time, Brooks's knee pain had been noted in the medical record (Tr. 287, 309, 327), but had not been particularly prominent as a condition requiring pain management or a source of disability. (*E.g.*, Tr. 97, 372–75.) However, the evidence thereafter shows a worsening of the degenerative condition in her right knee during the relevant period that the ALJ's decision does not sufficiently account for.

13

On November 11, 2013, Brooks's complaint of right knee pain resulted in Dr. Dozier's office ordering an x-ray of both knees. (Tr. 428.) The x-rays revealed "[p]rominent findings of chondromalacia of the patella and arthritic change in the right knee including some mild to moderate narrowing of the cartilage space in the medial compartment," with "[l]ess pronounced arthritic changes in the left knee." (Tr. 447.) Brooks received a steroid injection in her right knee on February 2, 2014 (Tr. 421–22), which relieved her pain for a week and a half. (Tr. 419.) On March 14, 2014, Brooks reported to the office of her primary care physician, Dr. Coleman, that the injection in her right knee had failed to provide sustained pain relief and that she was unable to walk as much as she would like due to the pain; she requested referral to an orthopedist. (Tr. 471.) By July 3, 2014, she reported to Dr. Dozier's office that her knees were "in a flare," and her physical examination yielded findings of limited ambulation, instability of the knee joints, and pain with walking. (Tr. 413.)

Dr. Coleman referred Brooks to an orthopedic clinic, where she presented on July 10, 2014, complaining of right knee pain when bearing weight and that the joint was unstable. (Tr. 445.) Although she was noted to walk without assistance and with a normal gait in the clinic, she was diagnosed with moderate medial compartment osteoarthritis of the right knee and was prescribed an anti-inflammatory while the clinic attempted to pre-certify Supartz[3] injections for her. *Id.* She received her first Supartz injection on July 15, 2014. (Tr. 444.) On August 19, 2014, Brooks presented to the orthopedic clinic for her second Supartz injection. (Tr. 443.) Although her knee

---

[3] Supartz is a gel-like substance that is manufactured from rooster and chicken combs and is used to temporarily treat the symptoms of knee osteoarthritis by lubricating the joint. It is delivered by injection into the joint space, in a series of either three or five injections. Ann Pietrangelo, *Synvisc v. Supartz: Similarities and Differences*, Healthline (Oct. 24, 2016), http://www.healthline.com/health/osteoarthritis/synvisc-supartz (last visited February 22, 2018).

14

was still tender to palpation and swollen, her symptoms had improved with the first injection and she was noted to ambulate in the clinic without difficulty or assistance. *Id.* Manipulation of her knee demonstrated a positive McMurray's sign, which indicates a torn meniscus.[4]

On September 10, 2014, Brooks was seen in Dr. Dozier's office and demonstrated limited ambulation. (Tr. 409.) She reported that the knee injections she had received were helping, but complained that the prescription medications she was taking did not relieve her pain for more than about three hours. (Tr. 410.) She was prescribed an extended-release morphine tablet for around-the-clock pain management, in addition to ibuprofen, a narcotic, and an extended-release formula anti-depressant used to treat neuropathic pain.

On September 19, 2014, Brooks received her third Supartz injection. (Tr. 442.) Her symptoms were improved and she ambulated without difficulty, but demonstrated moderate swelling of the right knee and positive McMurray's sign. *Id.* Although the record indicates that her treatment with Supartz was to have consisted of five injections (Tr. 443, 466), there is no evidence in the record that Brooks returned to the orthopedic clinic for her fourth or fifth injections. On October 23, 2014, she complained of bilateral knee pain to Dr. Coleman's office, where it was noted that she "states [she] needs knee replacement but is trying to hold off." (Tr. 464.)

At her March 2015 hearing before the ALJ, Brooks candidly testified that, while she still has pain in her right knee and it can flare up, the pain and stiffness has greatly improved since she had the Supartz injections. (Tr. 69–71.) Before receiving these injections, she testified, she could not bend the knee or sleep due to the pain and had suffered three falls. (Tr. 70–71.) She testified that she continued to take her prescribed dose of ibuprofen and a muscle relaxer to keep her knee

---

[4] *See McMurray Test*, Physical Therapy Web, http://physicaltherapyweb.com/mcmurray-test-orthopedic-examination-knee/ (last visited February 22, 2018).

15

pain at bay and takes the narcotics when necessary. (Tr. 73.) She concluded her testimony by clarifying the extent to which she is able to tolerate standing:

> I do, like, stand up at home. I do do things, but I can – I go sit down in the middle of it, you see what I'm saying? Like if I'm washing dishes and I have a lot of dishes to wash, I just quit and go sit down until the pain lessens. Then I get up and go finish what I'm doing. I don't never, ever stand over 30 minutes at a time.

(Tr. 81.)

The record amply demonstrates that Brooks has significant lower back and knee pathology, the effects of which are exacerbated by her obesity. By her own admission, the medical treatment she is receiving has relieved her associated symptoms to a significant extent. It is the province of the ALJ to weigh this evidence and the other evidence of record and to fashion from it an RFC finding that accounts for all of Brooks's credible impairment-related limitations. *See Ulman*, 693 F.3d at 713. "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, [courts] are not to second-guess[.]" *Id.* at 714. However, in the absence of such "substantial, legitimate evidence" supporting the ALJ's factual findings, the court may only affirm if the error resulting from the unsupported finding(s) is harmless. *Id.* While this standard of review is "highly deferential," *id.*, the "reviewing court does not act, even in credibility matters, as a mere rubber stamp" for the ALJ's decision on appeal. *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 846 (6th Cir. 1990).

While the ALJ found that Brooks's obesity "contributes to her limitations in performing climbing, kneeling, crawling, balancing, stooping, and crouching" (Tr. 35), he did not view it in combination with her arthritis pain as limiting her ability to stand or walk beyond the four hours he allowed for in his RFC finding. The ALJ rightly noted the instances in the record where Brooks was found on examination to walk with a normal gait or in an unlimited fashion. (Tr. 34.) However, the only such instances after the worsening of her right knee condition were Dr. Dozier's

September 10, 2014 office note describing normal gait (which the ALJ points out) but limited ambulation (which is not recognized in the ALJ's description) and the notes from the orthopedic clinic recording normal gait and unassisted ambulation from July to September of 2014. With regard to the latter, the ALJ found it notable that "even while undergoing injections to her knee, she was able to ambulate without difficulty." (Tr. 34.)

But even with the benefit of the Supartz injections and the medications Brooks is prescribed for breakthrough pain in her knee and back, her ability to stand for four hours a day, five days a week[5] is flatly disputed by Dr. Dozier in his assessment. (Tr. 458.) Of the medical opinions in the record, only Dr. Dozier's was rendered after Brooks began experiencing more severe knee pain in late 2013. While the ALJ was not required to tie his determination of Brooks's standing and walking limitation to a source medical opinion, *see Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727–28 (6th Cir. 2013), his inability to point to any supporting opinion evidence dated after 2013 or any contemporaneous description of Brooks's daily activity tolerance undermines the RFC determination, at least as it relates to that time period.

In any event, it is clear to the undersigned that Brooks cannot reasonably be found—as she was by the ALJ—capable of four hours of standing or walking after 2013, "[d]espite her knee pain, back pain and obesity," by reference to the activities she reported in early 2013. (Tr. 35.) Even though Brooks reported only mild knee and back pain in 2014 and 2015 with treatment, and demonstrated normal gait and ambulation following Supartz injections at the orthopedic clinic in mid-to-late 2014, those reports did not entail being on her feet for a prolonged period or at

---

[5] As the ALJ stated, ". . . RFC assessments must consider an individual's maximum remaining ability to do sustained work . . . on a regular and continuing basis, . . . mean[ing] 8 hours a day, for 5 days a week, or an equivalent work schedule." (Tr. 34) (quoting SSR 02-1p, 2002 WL 34686281 (Sept 12, 2002)).

17

sustained intervals. Indeed, the medical and testimonial evidence shows that her reports of pain were given in a range corresponding to her activity level (aggravated by movement, alleviated by rest) (Tr. 405–40), and that her knee pain in particular was worse after bearing weight and better with rest. (Tr. 443, 445.) The fact that Brooks was observed on clinical examination to walk normally does not occasion a finding that she is able to do so for extended periods of time.

On this record, and with regard to the time period beginning in or around November 2013 when Brooks's knee pain worsened to the point that new x-rays were ordered, the undersigned cannot find substantial evidence in support of the ALJ's determination that Brooks could stand or walk for half of the workday, as would be necessary to perform the range of light work identified in his decision. The matter requires further administrative consideration, and remand to the Commissioner is therefore recommended.

**IV. Recommendation**

In light of the foregoing, the Magistrate Judge RECOMMENDS that Brooks's motion for judgment on the administrative record (Doc. No. 18) be GRANTED, that the decision of the Commissioner be REVERSED, and that the cause REMANDED for further administrative proceedings consistent with this Report.

Any party has fourteen days after being served with this Report and Recommendation in which to file any written objections to it. A party opposing any objections filed shall have fourteen days after being served with the objections in which to file any response. Fed. R. Civ. P. 72(b)(2). Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters disposed of therein. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

ENTERED this 22nd day of February, 2018.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge